*In re* MÁXIMO MOLINA FRAGOSA, querellado.

*Número:* AB-2003-0173 *Resuelto:* 19 de diciembre de 2005

*Carmen H. Carlos*, directora de la Oficina de Inspección de Notarías; *Mariano Rosado Simmons*, querellante; *Máximo Molina Fragosa*, notario querellado.

PER CURIAM: Contra el Lic. Máximo Molina Fragosa se presentó una querella por autorizar una escritura que adolecía de defectos que impedían su inscripción. Luego de estudiar el expediente, los informes de la Oficina de Inspección de Notarías (ODIN), las respuestas del licenciado Molina Fragosa y la querella presentada, determinamos que éste violó los Cánones 18 y 35 del Código de Ética Profesional, 4 L.P.R.A. Ap. IX, el Art. 56 de la Ley Notarial, 4 L.P.R.A. sec. 2091, y la Regla 4 del Reglamento Notarial, 4 L.P.R.A. Ap. XXIV. A continuación exponemos los hechos que motivaron la presentación de la querella, según el informe presentado por la ODIN.

I

El licenciado Molina Fragosa fue contratado por el Sr. Eladio Robles en 1995 para que le ayudara con la segregación de un solar de su propiedad que interesaba dividir en dos lotes para venderlos. En marzo de 1995, se obtuvo la autorización de la Administración de Reglamentos y Permisos para segregar el solar. No obstante, no fue hasta el 4 de abril de 1996 que se segregó el solar mediante una escritura pública autorizada por el licenciado Molina Fragosa. Antes de que se autorizara esta escritura de segregación, el 28 de abril de 1995 el licenciado Molina Fragosa autorizó un testimonio de autenticidad (affidávit) en el cual el Sr. Eladio Robles vendió lo que iba a ser el primer lote al Sr. Miguel Ramos Colón y a la Sra. María Ojeda Otero (matrimonio Ramos-Ojeda) porque éstos tenían urgencia de tener un documento que acreditara su dominio sobre el lote. Puesto que ya habían vendido su residencia, deseaban comenzar a construir en el lote que el Sr. Eladio Robles les iba a vender. Según se desprende de la contestación a la querella que hiciera el licenciado Molina Fragosa, el matrimonio Ramos-Ojeda estaba presionando para que se realizara la venta del modo que fuera. El matrimo-

nio estaba preocupado porque entendía que no se iba a poder hacer la segregación prontamente, ya que el Sr. Eladio Robles no había conseguido las certificaciones necesarias del Internal Revenue Services para que los embargos federales que pesaban en contra de su propiedad fueran cancelados, y de este modo los lotes segregados estuvieran libres de cargas.

En 1996, luego de que el matrimonio Ramos-Ojeda construyera su hogar en lo que sería el lote número 1, se efectuó la segregación del solar del Sr. Eladio Robles, ya que el matrimonio Ramos-Ojeda necesitaba acreditar ante la Autoridad de Energía Eléctrica que eran propietarios del solar donde se encontraba su casa para que le conectaran la electricidad y para poder disfrutar de unos incentivos económicos. Esta segregación fue autorizada por el licenciado Molina Fragosa el 4 de abril de 1996. Luego de efectuada la segregación, ese mismo día, el notario Molina Fragosa autorizó la escritura de compraventa del lote número 1, venta que había sido realizada un año antes por medio de un testimonio de autenticidad. En esta compraventa el licenciado Molina Fragosa dio fe de que la propiedad que se vendía estaba libre de cargas y gravámenes, aun cuando le constaba que no se habían cancelado los embargos que afectaban la propiedad del Sr. Eladio Robles, si bien este último le informó al notario y al matrimonio Ramos-Ojeda que las deudas estaban satisfechas.

Seis días más tarde, el licenciado Molina Fragosa, sabiendo que los embargos federales que pesaban en contra de la propiedad del Sr. Eladio Robles no estaban cancelados, autorizó la compraventa del segundo lote resultante de la segregación. Los compradores de este lote fueron el Sr. Mariano Rosario Simmons junto con su esposa, la Sra. Carmen Avilés Negrón. En la escritura de compraventa del segundo lote el licenciado Molina Fragosa nuevamente dio fe de que la propiedad se encontraba libre de cargas y gravámenes. El 27 de agosto de 2003, el señor Rosario Si-

mmons presentó una querella contra el licenciado Molina Fragosa. El señor Rosario Simmons adujo que le interesaba vender su propiedad y que no había podido hacerlo porque el Registrador de la Propiedad se había negado a inscribir su título debido a que la escritura autorizada por el licenciado Molina Fragosa adolecía de defectos que impedían su inscripción. Los defectos que impedían la inscripción, según se desprende del informe de ODIN, eran que el licenciado Molina Fragosa había dado fe de que la propiedad estaba libre de cargas y gravámenes cuando en realidad no era así, y que éste no advirtió a los otorgantes sobre las consecuencias de vender y adquirir un inmueble sobre el que pendían embargos.

Antes de presentar la querella, el señor Rosario Simmons fue a la oficina del licenciado Molina Fragosa y le solicitó que solucionara el problema con la escritura. Durante el tiempo entre la visita del señor Rosario Simmons y la presentación de la querella, el licenciado Molina Fragosa hizo gestiones para que se cancelaran los embargos. No obstante, de los seis embargos que pesaban originalmente en contra de la propiedad quedaron cuatro sin cancelar.

Por otra parte, en la respuesta del licenciado Molina Fragosa a los informes de ODIN, éste se defendió señalando que: (1) las fincas que surgieron de la segregación eran nuevas fincas porque eran de una nueva cabida y, por lo tanto, no estaban afectadas por los embargos y estaban libres de cargas y gravámenes; (2) las partes sabían de los embargos y que él les había advertido las consecuencias de otorgar una escritura bajo esas condiciones; (3) les había recomendado a las partes esperar a que estuvieran cancelados los embargos para otorgar la escritura de compraventa, y (4) el testimonio de autenticidad que autorizó no contenía una compraventa sino una promesa de compraventa.

## II

En reiteradas ocasiones hemos señalado que los notarios están obligados a observar rigurosamente la Ley Notarial de Puerto Rico y su reglamento, los cánones del Código de Ética Profesional, las leyes pertinentes a los documentos que autorizan y la voluntad de las partes, porque de lo contrario se exponen a las sanciones disciplinarias correspondientes. La Regla 4 del Reglamento Notarial, *supra*, dispone que el notario es el representante de la fe pública y de la ley.([1]) Esto implica que cuando el notario autoriza documentos debe cerciorase de que la información y los hechos que contienen sean veraces, y que tanto los negocios que se realizan ante él como el modo de hacerlos cumplan con la normativa legal vigente. Faltar a la veracidad de los hechos en un documento notarial constituye una de las faltas más graves en que puede incurrir un notario, ya que vulnera la fe pública, pilar del derecho notarial. *In re González Maldonado*, 152 D.P.R. 871, 895-896 (2000). Además, esta conducta constituye una violación al Canon 35 del Código de Ética Profesional, *supra*.([2])

---

([1]) La Regla 4 del Reglamento Notarial señala:

"El Notario disfruta de plena autonomía e independencia en su función, sujeto solamente en organización jerárquica al Tribunal Supremo de Puerto Rico.

"En el ejercicio de su ministerio, el Notario representa la fe pública y la ley para todas las partes. Su obligación de ilustrar, de orientar y de advertir ha de desplegarla con imparcialidad." 4 L.P.R.A. Ap. XXIV.

([2]) El Canon 35 dispone:

"La conducta de cualquier miembro de la profesión legal ante los tribunales, para con sus representados y en las relaciones con sus compañeros debe ser sincera y honrada.

"No es sincero ni honrado el utilizar medios que sean inconsistentes con la verdad ni se debe inducir al juzgador a error utilizando artificios o una falsa relación de los hechos o del derecho. Es impropio variar o distorsionar las citas jurídicas, suprimir parte de ellas para transmitir una idea contraria a la que el verdadero contexto establece u ocultar alguna que le es conocida.

"El abogado debe ajustarse a la sinceridad de los hechos al examinar los testigos, al redactar af[f]idávit u otros documentos, y al presentar causas. El destruir evidencia documental o facilitar la desaparición de evidencia testifical en un caso es también altamente reprochable." 4 L.P.R.A. Ap. IX.

El licenciado Molina Fragosa faltó a la verdad cuando autorizó las escrituras de compraventa de los solares segregados del Sr. Eladio Robles[3] al dar fe de que estaban libres de cargas y gravámenes cuando le constaba que sobre dichas propiedades pesaban varios embargos federales.

El licenciado Molina Fragosa pretende defender su conducta sosteniendo que las partes conocían el hecho de los embargos, que les advirtió sobre el efecto jurídico de éstos y que les aconsejó no otorgar las escrituras hasta tanto estuvieran cancelados. Lo cierto es que dio fe de un hecho falso en la escritura y que cedió ante las presiones de las partes, cuando su obligación primordial como notario es con la ley y con la verdad, y no con las partes. Véase *In re Avilés, Tosado*, 157 D.P.R. 867, 890 (2002). Por otro lado, el licenciado Molina Fragosa sostiene que no dio fe de un hecho falso, ya que al segregarse la finca se crean nuevas fincas con nuevas dimensiones y que por lo tanto éstas no están afectadas por los embargos que pendían sobre la antigua finca. Esta aseveración lo que demuestra es un craso desconocimiento de la ley hipotecaria. La Ley Hipotecaria y del Registro de la Propiedad, en su Art. 85 (30 L.P.R.A. sec. 2306), establece que luego de una segregación los lotes resultantes estarán sujetos a los gravámenes que tuviera la propiedad antes de la división.[4] El desconoci-

---

[3] Las escrituras que contenían estos negocios jurídicos fueron la Escritura Número Dieciséis y la Escritura Número Diecisiete del Protocolo del licenciado Molina Fragosa de 1996.

[4] El Art. 85 de la Ley Hipotecaria y del Registro de la Propiedad dispone:

"Cuando una finca inscrita se divida en dos (2) o más fincas, cada una se inscribirá con un número diferente, anotándose en la finca original la división operada.

"Cuando se segregue parte de una finca inscrita para formar una nueva, se inscribirá la porción segregada con número diferente, expresándose esta circunstancia en la finca matriz.

"Cuando se segregue parte de una finca inscrita para agregarla a otra igualmente inscrita se practicará la inscripción correspondiente en el Registro de ésta, sin alterar su numeración, pero expresándose en ella la nueva descripción resultante y la procedencia de la porción agregada y se harán además las oportunas referencias por nota en las inscripciones de propiedad de ambas fincas.

"Cuando se segregue parte de una finca que radique en dos (2) o más demarcaciones y la finca a crearse perteneciera a una sola de aquéllas, se presentará el título

miento del licenciado Molina Fragosa de esta norma, evidenciado en su respuesta, y el ceder ante las presiones de las partes constituyen una violación al deber de diligencia y competencia contenido en el Canon 18 del Código de Ética Profesional, *supra.*([5])

en la sección donde se lleve el historial de la finca principal y el registrador deberá, de oficio, enviar dicho título acompañado de una certificación de título y cargas a la sección a que perteneciere la finca segregada. Si el registrador notificado, luego de calificar el título, practícase la segregación, dará conocimiento por escrito al registrador a cargo de la sección donde radicase la finca principal para que éste haga constar la segregación hecha. En caso de que la finca segregada perteneciera también a más de una demarcación, se estará a lo dispuesto en la sec. 2051 de este título.

"Cuando se agrupen dos (2) o más fincas para formar una sola, se inscribirá ésta con un nuevo número, poniéndose nota de correlación en cada una de las fincas que se agrupan.

"Cuando se agrupen o agreguen fincas que radiquen en más de una demarcación se presentará el título en la sección donde habrá de llevarse el historial de la finca principal, de acuerdo con la sec. 2051 de este título y de lo dispuesto en el Reglamento. La escritura de agrupación será presentada conjuntamente con una certificación de título y cargas expedidas por los registradores, a cargo de las secciones a cuya demarcación, pertenezcan las demás fincas constituyentes. La solicitud de certificación que deberá relacionar la escritura de agrupación, será presentada y asentada en el Diario de dichas secciones y se pondrá nota, al expedirse la certificación, al margen del folio de cada finca como aviso a terceros adquirentes.

"El registrador que tuviese bajo su consideración la escritura de agrupación informará a los demás registradores de la acción definitiva que tome respecto al documento. En caso de que se inscriba la agrupación se pondrá nota en los folios de cada una de las fincas constituyentes.

*"En todos los casos anteriores se expresará en las nuevas inscripciones la procedencia de las fincas, así como los gravámenes que tuvieren antes de la división, segregación, agregación o agrupación.*

"Cuando se forme una finca de dos (2) o más, o se segregue parte de alguna con objeto de enajenarla, se hará una sola inscripción comprensiva de la nueva finca agrupada o segregada y de la enajenación de la misma.

"En las escrituras públicas comprensivas de estas operaciones se describirán las fincas que se agrupen o las que se segreguen, así como las fincas nuevas y las porciones restantes que resulten de las mismas con sus modificaciones en la extensión y los linderos." (Énfasis suplido.) 30 L.P.R.A. sec. 2306.

([5]) El Canon 18 establece:

"Será impropio de un abogado asumir una representación profesional cuando está consciente de que no puede rendir una labor idónea competente y que no puede prepararse adecuadamente sin que ello apareje gastos o demoras irrazonables a su cliente o a la administración de la justicia.

"Es deber del abogado defender los intereses del cliente diligentemente, desplegando en cada caso su más profundo saber y habilidad y actuando en aquella forma que la profesión jurídica en general estima adecuada y responsable.

"Este deber de desempeñarse en forma capaz y diligente no significa que el abogado puede realizar cualquier acto que sea conveniente con el propósito de salir triunfante en las causas del cliente. La misión del abogado no le permite que en defensa de un cliente viole las leyes del país o cometa algún engaño. Por consiguiente, al sostener las causas del cliente, debe actuar dentro de los límites de la ley,

## III

 El licenciado Molina Fragosa también infringió la Ley Notarial al autorizar la compraventa del primer lote por medio de un testimonio de autenticidad. El Art. 56 de la Ley Notarial, *supra*, dispone que no se podrá hacer por medio de testimonio de autenticidad negocios que tengan por objeto la creación, transmisión, modificación o extinción de derechos reales sobre bienes inmuebles.([6]) El li-

---

teniendo en cuenta no sólo la letra de ésta, sino el espíritu y los propósitos que la informan. No debe tampoco ceder en el cumplimiento de su deber por temor a perder el favor judicial ni la estimación popular. No obstante, un abogado puede asumir cualquier representación profesional si se prepara adecuadamente para ello y no impone gastos ni demoras irrazonables a su cliente y a la administración de la justicia." 4 L.P.R.A. Ap. IX.

En reiteradas ocasiones hemos sostenido que este canon aplica también a los abogados en su función notarial. Véase *In re Cardona Ubiñas*, 156 D.P.R. 340 (2002).

([6]) El Art. 56 de la Ley Notarial dispone:

"Llámese testimonio o declaración de autenticidad al documento mediante el cual un notario a requerimiento de parte interesada, da testimonio de fe de un documento no matriz, además de la fecha del testimonio:

"(1) De la legitimación de las firmas que en él aparezcan, siempre que no se trate de los actos comprendidos en los incisos (1) al (6) de la sec. 3453 del Título 31;

"(2) de haber tomado juramento por escrito;

"(3) de que es traducción fiel y exacta de otro, siempre que conozca ambos idiomas y así lo certifique el propio testimonio;

"(4) de que es copia fiel y exacta de un documento que no obra en un Protocolo Notarial;

"(5) o en general, de la identidad de cualquier objeto o cosa.

"Podrá el notario, a requerimiento de partes interesadas, dar testimonio de fe en un documento no matriz, de la legitimación de las firmas que en él aparezcan, siempre que no se trate de los actos comprendidos en los incisos (1) al (6) de la sec. 3453 del Título 31 vigente, que una traducción o copia fiel y exacta de cualquier documento que no obre en su protocolo o, en general, de la identidad de cualquier objeto o cosa.

"Sólo los notarios podrán dar testimonio de hechos, actos o contratos de mero interés particular sin perjuicio de lo dispuesto en cualesquiera leyes vigentes. Las declaraciones de autenticidad podrán comprender o no el juramento.

"No podrán los notarios autorizar testimonios en los casos comprendidos en la sec. 2005 de este título, ni en los incisos (1) al (6) de la sec. 3453 del Título 31. Esta prohibición incluye específicamente los contratos de venta de inmueble que pretendan expresar o implícitamente, adjudicar porciones específicas en un inmueble cuya segregación no haya sido previamente aprobada por las agencias correspondientes.

"El notario no asume responsabilidad alguna por el contenido del documento privado cuyas firmas legitime." 4 L.P.R.A. sec. 2091.

El Art. 1232 del Código Civil, 31 L.P.R.A. sec. 3453, establece:

"Deberán constar en documento público:

cenciado Molina Fragosa sostiene que el testimonio de autenticidad que autorizó no contenía un negocio de transmisión de derechos reales sobre el inmueble, sino una promesa de compraventa. Sin embargo, tanto el lenguaje utilizado en el documento como los eventos posteriores a su autorización, confirman que el contenido del testimonio de autenticidad era en efecto una compraventa. En el affidávit se señala que las partes habían acordado hacer la compraventa del inmueble, que en ese acto se le entregó al vendedor un cheque por la suma estipulada para la venta, y que las partes acordaron otorgar la correspondiente escritura pública en treinta días. Luego de la autorización de este testimonio de autenticidad, el matrimonio Ramos-Ojeda procedió a construir su hogar en el terreno que habían adquirido del Sr. Eladio Robles. No existe duda que el licenciado Molina Fragosa autorizó una venta en ese testimonio de autenticidad y que violó, por lo tanto, las disposiciones del Art. 56 de la Ley Notarial, *supra*.

---

"(1) Los actos y contratos que tengan por objeto la creación, transmisión, modificación o extinción de derechos reales sobre bienes inmuebles.

"(2) Los arrendamientos de estos mismos bienes por seis (6) o más años, siempre que deban perjudicar a tercero.

"(3) Las capitulaciones matrimoniales y la constitución y aumento de la dote siempre que se intente hacerlas valer contra terceras personas.

"(4) La cesión, repudiación y renuncia de los derechos hereditarios o de los de la sociedad conyugal.

"(5) El poder general para pleitos y los especiales que deban presentarse en juicio; el poder para administrar bienes, y cualquier otro que tenga por objeto un acto redactado o que deba redactarse en escritura pública, o haya de perjudicar a tercero.

"(6) La cesión de acciones o derechos procedentes de un acto consignado en escritura pública.

"También deberán hacerse constar por escrito, aunque sea privado, los demás contratos en que la cuantía de las prestaciones de uno o de los dos contratantes exceda de trescientos (300) dólares.

"En todo caso, los contratos efectuados por intervención de mandatario deberán constar en documento auténtico, concediéndose por la presente sección a los jueces de distrito y de paz, en ausencia de notario, facultades para certificar las declaraciones de autenticidad de dichos contratos, en la forma determinada por las secs. 887 *et seq.* del Título 4.

"No obstante lo dispuesto en el párrafo precedente, serán válidos los contratos de comercio efectuados por correspondencia, y todos aquéllos en que la formalidad del documento auténtico pueda constituir una demora perjudicial a la naturaleza y rapidez del tráfico mercantil."

## IV

Según se desprende de la discusión que antecede, el licenciado Molina Fragosa violó los Cánones 18 y 35 del Código de Ética Profesional, el Art. 56 de la Ley Notarial y la Regla 4 del Reglamento Notarial, *supra.* Sin embargo, esta es su primera falta. Además, el licenciado Molina Fragosa asumió un rol activo en tratar de solucionar los problemas que causó con la autorización de las escrituras de compraventa, lo que atenúa la gravedad de sus acciones. Por todo lo anterior, *decretamos las suspensión del licenciado Molina Fragosa de la práctica de la notaría por el término de cuatro meses y hasta que otra cosa provea este Tribunal. Se ordena a la Oficina del Alguacil que incaute su obra notarial para el trámite de rigor correspondiente por la Directora de Inspección de Notarías.*

*Se dictará sentencia de conformidad.*